IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARITZA AMADOR, *individually and as representative of the Estate of Gilbert Flores and as next friend of minor* R.M.F., VANESSA FLORES, MARISELA FLORES, CARMEN FLORES, ROGELIO FLORES, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 5:15-cv-810-RP |
| BEXAR COUNTY, OFFICER GREG VASQUEZ, *individually and in his official capacity*, ROBERT SANCHEZ, *individually and in his official capacity*, | § § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are two motions: (1) Motion for Summary Judgment by Defendants Bexar County, Bexar County Sheriff's Office, Gregory Vasquez, in his official capacity, and Robert Sanchez, in his official capacity, (Dkt. 112); and (2) Motion for Summary Judgment by Defendants Gregory Vasquez and Robert Sanchez, (Dkt. 110). Having reviewed Defendants' motions, Plaintiffs' responses, and the relevant evidence and case law, the Court issues the following order.

### I. BACKGROUND

Plaintiffs Maritza Amador—individually and as representative of the Estate of Gilbert Flores and as next friend of minor R.M.F.—Vanessa Flores, Marisela Flores, Carmen Flores, and Rogelio Flores filed this suit in September 2015 as the surviving family members of Gilbert Flores. On August 28, 2015, Gilbert Flores was shot and killed by two deputies with the Bexar County Sheriff's Office—Defendants Gregory Vasquez and Robert Sanchez. The incident began with a domestic disturbance at Flores's residence and a call to 911 for assistance. (Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 3). While en route to the residence in separate

vehicles, Bexar County Sheriff's deputies Vasquez and Sanchez were told by dispatch that Flores was

upset and had indicated he wanted to commit "suicide by cop." *Id.* Vasquez arrived first, went to the

front door, and had an altercation with Flores, who was holding a knife, outside the house. *Id.* Then

Sanchez arrived at the house. *Id.* The deputies reported on their radio that Flores was going back

into the house. *Id.* Sanchez fired a shot at Flores but missed. *Id.*

Flores went back to the residence, retrieved two metal folding chairs, and came back outside.

(Plaintiffs' Expert Report, Dkt. 129, Ex. 6, at 12). Flores allegedly came at Vasquez with the knife,

who discharged his Taser and struck the chair Flores was holding. *Id.* Vasquez struck Flores with his

Taser, and the Taser fell from Vasquez's hand onto the street. *Id.* at 13. Flores went back towards his

residence. *Id.*

At that point, a bystander began filming the incident on his phone. The video presents a

mostly unobstructed view[1] of Flores and the deputies in the approximately eight minutes before the

shooting. (*See* Flash Drive Containing the Video, Dkt. 131).[2] The video is taken by a neighbor from

his second-floor apartment. (Plaintiffs' Expert Report, Dkt. 129, Ex. 6, at 12). As seen in the video,

between the neighbor's apartment and Flores's house is a drainage ditch, an open grassy area, and

the street. The neighbor zooms in, and the viewer can see the incident unfold. Both parties claim the

video of the incident proves their version of events.

The video begins with the deputies standing, with their backs to the camera, on the street

outside Flores's house. Flores, facing the camera, appears at about the 20-second mark standing

outside near his front door. Flores appears to be talking and gesturing and is wearing only long

---

[1] The points of possible obstruction are as follows. The video, for the first approximately 45 seconds, is filmed
through a window screen that obscures the view of the scene. At about time stamp 5:15, the deputies walk off screen
as they are backing away, at some distance, from Flores. Flores continues to be visible, but the deputies do not
reappear until approximately minute 7:00. From that point until the shooting, the video shows Flores and the
deputies except for two brief moments Flores can't be seen because Vasquez's patrol car is between Flores and the
camera.
[2] The flash drive containing the video was brought to the Clerk's Office and filed as [131] and [132] "Motion to
Supplement" Plaintiffs' two responses in opposition to Defendants' two motions for summary judgment.

shorts and shoes. The deputies are each holding a gun, and Vasquez holds a protective shield in his other hand. For the next several minutes, Flores continues to talk. At the 4:25 mark on the video, Flores walks into his front yard and picks up the folding chairs. At 4:40, he walks onto the street, and the deputies move away from him. At 4:45, he picks up the Taser off the ground as the deputies continue to distance themselves. Flores walks back to his front yard, drops the chairs, and walks back to the street holding the Taser. Flores throws the Taser in a direction away from the deputies. Back on his lawn, Flores begins to walk towards the deputies, who are off camera, and onto his next door neighbor's driveway. He continues to talk and gesture as he backs away from the deputies and towards his house. At 6:50, he picks up the chairs, unfolds them, and sets them on his front porch.

At 7:05, he walks away the deputies towards Vasquez's unlocked patrol car that is parked in the street, not right at the curb, (Flash drive containing the video, Dkt. 131), and has keys in the ignition and an AR-15 inside the car in a "holder," (Deposition testimony of Vasquez, Dkt. 110, Ex. 5, at 15–16). Because Flores is on the other side of the car from the camera, the viewer cannot discern what he does in those moments. Vasquez points his gun at Flores. Flores, who now appears to be barefoot, walks from the car and towards the deputies while continuing to talk and gesture. The deputies again back away. At 7:20, Flores walks away from the deputies and back towards the car. The deputies again advance towards Flores, and the viewer cannot see Flores while he is on the other side of the car. Flores reappears at 7:28. He stands in his driveway, not right next to the car and with some distance from the deputies. At 7:32, Flores moves the knife from his right hand to his left hand. Sanchez has his gun drawn. Deputy Estrada's patrol car siren is heard in the background.[3]

At 7:33, Flores stops walking and stands stationary in the driveway. He is about 29 feet away from Vasquez who is holding his protective shield and pointing his gun at Flores. (Plaintiffs' Expert

---

[3] Deputy Estrada was en route to the scene as back-up.

Report, Dkt. 129, Ex. 6, at 16). Vasquez is in the street, standing next to a black sedan parked at the curb. *Id.* Sanchez is standing about 14 feet to the left of Vasquez, further into the middle of the street, and about 29 feet away from Flores. *Id.* There is nothing behind the deputies blocking a possible retreat. Sanchez continues to have his gun pointed at Flores.

At about 7:35, Flores, still stationary in the driveway, puts both arms up in the air in a surrender pose. He remains motionless, with his hands in the air, for several seconds. Sanchez looks to Vasquez, and, according to their testimony, the deputies agree that they were going to end it. (*See, e.g.*, Deposition testimony of Vasquez, Dkt. 110, Ex. 5, at 23–24). At about 7:37, Vasquez shoots Flores, while he is motionless in the surrender pose, his feet still stationary. Sanchez immediately also shoots Flores, who collapses backwards onto the pavement and succumbs to the fatal gunshot wounds. At about 7:50, Estrada arrives and parks on the street near the black sedan.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a

genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view this evidence in the light most favorable to the nonmovant, *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993), and will "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III. DISCUSSION

In their motions for summary judgment, Defendants make the following arguments:

(a) Bexar County Sheriff's Office is not a proper party and should be dismissed.
(b) The claims against the deputies in their official capacity are redundant and should be dismissed.
(c) The training provided to the deputies by the Sheriff's Office was not insufficient and shows that there was not deliberate indifference to the need for training.
(d) The Sheriff's Office policy manual regarding the use of force is not unlawful and does not demonstrate deliberate indifference.
(e) The Sheriff's Office conducted two investigations into the incident that led to Flores's death, and those investigations were not inadequate.
(f) Defendants Vasquez and Sanchez are entitled to qualified immunity.

In their response, Plaintiffs note that the Bexar County Sheriff's Office was dismissed as a separate party by the Court on October 15, 2015. (Plaintiff's Response to Bexar County Motion for Summary Judgment, Dkt. 130, at 2). Plaintiffs concede that "suing the Deputies in their official capacity is incorporated within their claims against Bexar County as the Deputies were within the course and scope of their employment with the Bexar County Sheriff's Office at the time of the shooting . . . ." *Id.* Plaintiffs also withdraw their claims against Bexar County for claims related to the investigative and discipline process. *Id.*

Therefore, Defendants' arguments before the Court are narrowed to:

(a)  The training provided to the deputies by the Sheriff's Office was not insufficient and shows that there was not deliberate indifference to the need for training.

(b)  The Sheriff's Office policy manual regarding the use of force is not unlawful and does not demonstrate deliberate indifference.

(c)  Defendants Vasquez and Sanchez are entitled to qualified immunity.

*A.     Municipal Liability*

Plaintiffs allege Bexar County is liable under Section 1983 because (1) it maintained unconstitutional policies, and (2) it failed to adequately supervise or train its deputies. (Dkt. 130). It is well established that a governmental entity is not liable under Section 1983 on the theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under Section 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." *See Monell*, 436 U.S. at 691. Hence, a plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (internal quotation marks omitted).

*1.     Bexar County's Policy Manual*

Bexar County argues that (1) the Bexar County Sheriff's Office Manual sets out policies that, "when read in harmony with each other rather than in isolated pieces," are not unlawful and do not show deliberate indifference and (2) Plaintiffs fail to show a causal link between the policies they criticize and this incident or other instances that would suggest deliberate indifference. (Bexar County's Motion for Summary Judgment, Dkt. 112).

The Bexar County Sheriff's Office Manual (the "Policy Manual"), in pertinent part, contains the following provisions on use of force and use of deadly force. (Policy Manual, Dkt. 112, Ex. 2).

CHAPTER 9 – USE OF FORCE
REV. APRIL 15, 2014

## 9.01 POLICY

It is the policy of the Bexar County Sheriff's Office that deputies use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others the use of force must be objectively reasonable. The deputy must only use that force which a reasonably prudent officer would use under the same or similar circumstances.

## 9.02 PURPOSE

* * *

B. In each instance of the use of force, the officer should exhaust every reasonable means of employing the minimum amount of force to affect an objective before escalating to the next, more forceful method. However, an officer is not required to engage in prolonged combat or struggle rather than resorting to that method which will most quickly and safely bring the situation under control.

* * *

F. Where possible, an officer will use verbal persuasion first, followed thereafter in ascending order, by:
1. Physical strength and skill, ranging from restraint and come along holds to hand or foot strikes;
2. Approved ASP® baton used in the prescribed manner, chemical agents, Electronic Control Device (ECD)/Electronic Control Weapon (ECW); and
3. Approved firearm. Deputies must bear in mind the order of this continuum of force is not absolute, and the situation may require immediate use of a higher level of force.

* * *

## 9.10 USE OF DEADLY FORCE

A. Preparation for use of deadly force.
1. To effectively accomplish their duties, it is recognized that during certain situations, an officer may find himself in a position of having to threaten the use of deadly force to thwart an arising situation possessing the immediate potential of leading to the necessity to protect life or prevent serious bodily injury.
2. Deputies may make special preparations for the use of deadly force as they observe the need to do so, consistent with 9.05, above.

* * *

e. Generally, an officer may use deadly force only in situations, which indicate that, the officer or another person may be seriously injured or killed if the deadly force is not used.
f. "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use, is capable of causing, death or serious bodily injury:

1) The discharge of a firearm is deadly force if directed at a person or at a location where persons may be;

\* \* \*

g. It shall be incumbent on every officer to exhaust every reasonable means of employing only that amount of deadly force necessary to accomplish the purpose.
h. Where feasible, a verbal warning shall be given to the offender prior to the use of deadly force.
i. Once the immediate danger of death or serious bodily injury to an officer or another person has passed, deadly force shall not be used.
j. To the extent an officer has reasonable time for consideration, he shall never use deadly force which creates a greater risk to self and others (such as hostages, bystanders, and other Deputies) of death or serious bodily injury, than if he did not use such deadly force. This decision must reflect the circumstances . . . .

\* \* \*

n. The following are examples which may be considered deadly force situations depending on the circumstance:
1) Shooting at, or stabbing an officer;
2) Striking an officer with a club or a blunt instrument;
3) The pointing of a firearm at an officer;
4) Advancement towards an officer by a suspect exhibiting a firearm, knife or club in a manner and in close enough proximity to the officer to give reason to believe that the officer may be assaulted;
5) A physical struggle in which the suspect is attempting to remove or has removed the officer's firearm or less lethal weaponry from the officer's possession.

Plaintiffs maintain that the Policy Manual: (1) fails to define what an imminent threat is with regard to the use of deadly force and does not state that that the immediate threat must be objectively reasonable; (2) starts with an objective basis for the use of deadly force but then impermissibly moves to a subjective standard that allows the officer to use her personal judgment for what continuum of force is necessary based on what the officer believes will help control the situation quickly and safely; (3) sets out the goal of expediency so that an officer need not engage in a prolonged struggle and can skip the continuum of force if the officer subjectively believes it is the most efficient way to end the event; and (4) allows an officer to use deadly force even when there is no immediate danger. (Plaintiff's Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 8).

The test of reasonableness under the Fourth Amendment is an objective one. *L.A. Cty. v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Under the "objective reasonableness" standard, the inquiry is whether an officer's actions are objectively reasonable in light of the facts and circumstances confronting them. *Graham*, 490 U.S. at 397. The question therefore is whether the Policy Manual comports with this standard.

The thrust of Plaintiffs' argument is that the Policy Manual shifts from the permissible objective standard to impermissible subjective standards for the use of deadly force. To support their argument, Plaintiffs rely on *Davis v. Montgomery Cty*, No. CIV.A. H:07-505, 2009 WL 1226904 (S.D. Tex. Apr. 30, 2009). In *Davis*, the court evaluated whether Montgomery County's policy regarding the use of force was consistent with the Constitution. *Id.* at *7. A county official, when asked about Montgomery County's policy regarding the use of force, "responded that the key to determining the appropriate level of force is 'what the officer may have felt was reasonable.'" *Id.* The court found that that statement of policy suggested a subjective standard in violation of the constitutional requirement of objective reasonableness. *Id.*

In this case, the Policy Manual provides an objective reasonableness standard in the use of force section 9.01: "It is the policy of the Bexar County Sheriff's Office that deputies use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others the use of force must be objectively reasonable. The deputy must only use that force which a reasonably prudent officer would use under the same or similar circumstances." (Bexar County's Motion for Summary Judgment, Dkt. 112, Ex. 2). To the contrary, section 9.10 on deadly force does not provide a similar objective reasonableness standard. Bexar County attempts to cure that deficiency by arguing that the Policy Manual should be read as a whole. Reading 9.01 (use of force) in conjunction with 9.10 (use of deadly force) at best leads the

Court to conclude the Policy Manual is ambiguous. It also highlights that the Bexar County Sheriff was aware of the objective reasonableness standard but yet applied it in only one section.

Plaintiffs further rely on the testimony of Deputies Vasquez and Sanchez. The deputies testified that they were justified in shooting Flores based on their subjective beliefs that they were in imminent danger. (Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 11-12). For example, Deputy Sanchez was asked: "[C]ould you have legally, within the Bexar Sheriff County policy and the law the way you were taught it, shoot and kill that person?" *Id.* at 11. His response was: "As long as I feel that he's a threat to my life or to Deputy Vasquez or to a family member, yes." *Id.* Their testimony makes sense given that the Policy Manual states an arguably subjective standard: "Generally, an officer may use deadly force only in situations, which indicate that, the officer or another person may be seriously injured or killed if the deadly force is not used." (Sanchez deposition testimony, Dkt. 112, Ex. 2).

In fact, Deputies Vasquez and Sanchez's supervisor Sergeant Pedraza testified that he was not told, and did not know, the definition of the term "objectively reasonable" in a use of force context:

> Q: In all of your training with the Bexar County Sheriff's Department, you've never had anybody tell you what an objectively reasonable use of force would be?
> A: No, sir.

(Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 12).

In addition to the testimony of the deputies and Sergeant Pedraza, Plaintiffs present the deposition testimony of Sergeant Baeza, who investigated the shooting, and determined there were no policy violations when the deputies used deadly force based on their subjective beliefs:

> Q: So is your understanding of Bexar County policy that even if a reasonably prudent officer would not use force, if the subjective belief of the officer involved was such that he was in fear of his life he could use force?
> A: Yes. If that officer feels like he needs to use force because he is in fear of his safety, then, yes, he can use force at that time.

> Q: Even if a reasonably prudent officer wouldn't have under the same or similar circumstances?
> A: [I] mean, if you're the one that's in that situation and you're fearing for your life at that moment . . . then you're going to be justified in using the force.

(Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 14).

While Plaintiffs may have offered sufficient evidence showing that Bexar County's Policy Manual was inadequate, Plaintiffs also must show that the policy was adopted with "deliberate indifference." "Only where a municipality's failure to [establish a policy] in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694) (bracketed text in original). "Deliberate indifference is a stringent standard of fault" and requires a showing of "more than negligence or even gross negligence." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *City of Canton*, 489 U.S. at 388).

In this case, Plaintiffs' strongest evidence of deliberate indifference is Sergeant Baeza's testimony, which conceivably shows that Bexar County, through its internal investigation, had the requisite knowledge and condoned the deputies' conduct that was impermissibly based on their subjective belief that they were in imminent danger. *See Davis*, 2009 WL 1226904, at *7 ("Plaintiff also provides evidence that the County approved of [the officer's] actions based on [the officer's] feeling that [the suspect] was a threat to him . . . . This approval is consistent with a policy which condones the use of deadly force based on a subjective analysis."). However, Sergeant Baeza is not a final policymaker for Bexar County through whom Bexar County could be liable, and Plaintiffs do not argue otherwise. "A single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000) (internal brackets omitted). However, this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker. *Bolton v.*

*City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008). The question of "[w]hether a particular official has **final policymaking** authority is a question of state law," *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir.2003) (emphasis in original), and courts have held that a deputy or sergeant is not an official with policymaking authority for a governmental entity, *see, e.g., Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) ("[T]he only County officials or employees whose conduct is complained of are Mendiola and Courtney, each of whom was only a deputy sheriff and hence was not a policymaker."); *Hudson v. Lujan*, No. 3:15-CV-3337-G-BK, 2016 WL 3198052, at *3 (N.D. Tex. May 17, 2016), report and recommendation adopted, No. 3:15-CV-3337-G (BK), 2016 WL 3182024 (N.D. Tex. June 8, 2016) ("[T]here is no allegation (nor could there be) that the sergeant is an official with policymaking authority for the City.")

Finally, Plaintiffs must also show a constitutional violation whose moving force is that policy. *Pineda*, 291 F.3d at 328. To succeed, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Again, Plaintiffs point to the testimony of people who are not final policymakers: the deputies and their subjective belief that Flores posed an imminent threat that led them to shoot him, to Sergeant Pedraza's testimony in which he said he neither knew what objectively reasonable was nor had been trained on it, and to Sergeant Baeza's testimony that the deputies did not violate Bexar County policy. Even if the testimony shows a violation of Flores's constitutional rights and even if the deputies' actions were the moving force behind the violation, the decisions of the deputies and sergeants are not decisions that can be elevated and attributed to Bexar County. *See Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) (holding that a city could not be held liable for a captain's decision to order entry into the home, even if it was "arguably the 'moving force' behind the constitutional violations that resulted in the suspect's death, because his decision was not

a decision by a final policymaker of the city"). Accordingly, the Court grants summary judgment in favor of Bexar County on Plaintiffs' claims that Bexar County's Policy Manual was inadequate.

      B.       *Bexar County's Training and Supervision*

In its motion, Bexar County argues that Plaintiffs cannot succeed on their claim that Bexar County's training pertaining to the use of deadly force and non-lethal control devices and tactics was inadequate. Bexar County contends that (1) Plaintiffs provide no specific examples about what training the deputies should have been received or how their training was lacking; (2) the Bexar County Sheriff's Office provides a sufficient number of required classes throughout the year; (3) Bexar County needs only to show that its training was in compliance with the state-mandated training standard; and (4) Plaintiffs cannot show that "TCOLE training" is inadequate.

Bexar County also asserts that (1) the Bexar County Sheriff's Office supervision policy was adequate on its face; (2) instructions provided to the deputies during the incident are not actionable policy statements; (3) Plaintiffs fail to show the policy ordered the use of unjustified deadly force and that it was adopted and maintained with deliberate indifference to the constitutional rights of citizens; and (4) Bexar County cannot be held liable for the actions of the supervisors based on this incident alone.

Under certain circumstances, a county can be liable for a failure to train its employees. *See Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000). The plaintiff must show that: "(1) the county's training policy procedures were inadequate, (2) the county was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation." *Kitchen v. Dall. Cty.*, 759 F.3d 468, 484 (5th Cir. 2014). Deliberate indifference can be established by demonstrating a pattern of violations or, in limited circumstances, by "single-incident liability" where a violation would result from the "highly predictable consequence" of a particular failure to train. *Id.*

Plaintiffs do not claim that Bexar County's training is inadequate in the sense that the deputies should have taken additional education classes; rather, Plaintiffs claim that because the Policy Manual is unconstitutional on its face, Bexar County was aware that a constitutional violation would likely occur and therefore showed deliberate indifference. (Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130, at 19). Plaintiffs argue that this case falls within the narrow exception allowing a single incident of misconduct to give rise to a claim of deliberate indifference.

A single incident is usually insufficient to demonstrate deliberate indifference. *See, e.g.*, *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (explaining that proof of deliberate indifference "generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights") (internal quotation marks omitted). Deliberate indifference requires that Plaintiffs "show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights." *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) (internal quotation marks omitted). The Fifth Circuit "has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat superior liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).

The circumstances necessary to find that a single instance of failure to train an officer are not present here. "[T]o hold a municipality liable for failure to train an officer, it must have been obvious that the highly predictable consequence of not training its officers was that they would apply force in such a way that the Fourth Amendment rights of citizens were at risk." *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009) (internal quotation marks omitted). Plaintiffs have proffered no evidence showing that Bexar County was aware of any risk of injury from its failure to adequately train and no evidence that the improper use of deadly force had caused previous constitutional violations. Plaintiffs presented no material fact question to show that it should have

14

been obvious to the policymakers that the risk of serious injury was a "highly predictable consequence" of the failure to train. *See id.* Accordingly, the Court grants summary judgment to Bexar County on Plaintiffs' claims for training liability.

Plaintiffs also state that Bexar County's supervision policy was inadequate. When, as here, a plaintiff alleges a failure to supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis*, 406 F.3d at 381. Plaintiffs, however, fail to provide any substantive analysis or case law support for their contention in their response. (*See* Plaintiffs' Response to Bexar County's Motion for Summary Judgment, Dkt. 130). Plaintiffs therefore have failed to raise a genuine issue of material fact as to supervision, and Bexar County is entitled to summary judgment on the issue of whether it is liable for inadequate supervision.

C.     *Qualified Immunity*

Defendants Vasquez and Sanchez claim they are entitled to qualified immunity. "Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted). To overcome a claim of qualified immunity, a plaintiff must show that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court has discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1.     *Deputies Vasquez and Sanchez Violated Flores's Constitutional Right*

The Court first considers whether Defendants Vasquez and Sanchez violated a constitutional right when they killed Flores by using excessive force and whether that use of force was objectively

unreasonable. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The inquiry requires analyzing the totality of the circumstances. *Plumhoff*, 134 S. Ct. at 2020.

However, when a law enforcement officer uses deadly force, the "objective reasonableness balancing test is constrained. It is objectively unreasonable to use deadly force unless it is necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)) (internal quotation marks omitted). In *Manis v. Lawson*, the Fifth Circuit explained that the focus of the inquiry is "the act that led [the officer] to discharge his weapon." 585 F.3d 839, 845 (5th Cir. 2009).

 In this case, the deputies attempt to support their claim for qualified immunity by arguing that their conduct should be judged based on the circumstances that confronted them. (Deputies' Motion for Summary Judgment, Dkt. 110 at 12). The Court agrees, to an extent. The Court looks to the circumstances they encountered but focuses its inquiry on the moment before the deputies shot Flores. In the approximately twelve minutes before they shot Flores, the deputies testified that

Flores disobeyed their commands that he drop his knife; Vasquez testified that Flores attacked him with the knife; the deputies testified that Flores opened the door to a patrol car that had keys in the ignition and an AR-15 inside; the deputies testified Flores attempted to use Vasquez's Taser against the deputies; the deputies testified that Flores stated that he wanted to commit "suicide by cop;" and the deputies testified that Flores took his knife from his waistband and positioned the knife in his left hand in a "pre-attack indicator mode, gripping the handle of the knife." *Id.*

Construing the facts in a light favorable to the nonmovant Plaintiffs, the Court finds there are genuine issues of factual dispute with several of the scenarios posed by the deputies. First, Plaintiffs admit that the deputies radioed that Flores was attempting to enter the patrol car, but it is not clear whether Flores did open the door or did look inside to see the keys in the ignition or see the weapon that was inside the SUV. (Plaintiffs' Response to Deputies' Motion for Summary Judgment, Dkt. 129, at 3). Second, the deputies testified that Flores, when he picked up Vasquez's Taser that had been left on the street, "attempted to use [it or] activate it against the deputies." (Deputies' Motion for Summary Judgment, Dkt. 110, at 12). Although Flores did pick up the Taser off the street and appears to have looked at it, he quickly tossed it away. (Flash drive containing the video, Dkt. 131). A reasonable officer would not have necessarily assumed that Flores was attempting to activate it in use against the officers. Additionally, Flores threw the Taser away from the scene, and the deputies do not claim he threw it at them.

Finally, and perhaps of most significance, there is disagreement between the parties about the moment before the deputies shot Flores. In those several seconds, Flores held a knife in one hand and had both of his hands up. *Id.* He was not moving towards the deputies. *Id.* Much of the rest seems to be in dispute, and the Court must construe the facts in favor of Plaintiffs. *See, e.g., Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (holding that, in a deadly force case, the Fifth Circuit improperly failed to credit the nonmovant's evidence and draw reasonable inferences in his favor on

the defendant's motion for summary judgment). Defendants' expert claims that the way Flores held the knife is in a "pre-attack indicator mode, gripping the handle of the knife." (Deputies' Motion for Summary Judgment, Dkt. 110, at 12). Plaintiffs describe it differently: Flores "exchang[ed] the knife from his right hand to his left hand while his hands were down at his side." (Plaintiffs' Response to Deputies' Motion for Summary Judgment, Dkt. 129, at 3). According to Plaintiffs, Flores, who was no longer next to the patrol car and was back on his driveway some twenty or more feet away from the deputies, then "raised both of his hands directly above his head with the knife 'palmed' in his left hand" and "raised his hands in apparent surrender, stood still, his hands were not moving, his feet were not moving, he was not moving or advancing toward the Deputies and no family members of neighbors were outside or in the vicinity." *Id.* at 3–4 & 11.

Plaintiffs emphasize that the deputies testified they conferred with each other before shooting Flores and agreed that the encounter had gone on too long and they were going to end it. *Id.* at 5 & n.23. Plaintiffs argue that their discussion before shooting Flores shows that they were not under an immediate threat of harm. *Id.* at 12. Plaintiffs additionally point to discrepancies between what is seen in the video and the deputies' testimony, including the distance between Flores and the deputies and whether Flores was moving towards the deputies. *Id.* at 13. The parties' experts also analyze Flores' action—or inaction—before the shots were fired and reach contrary conclusions about how a reasonable officer would have viewed Flores's actions. *Id.* at 13-15.

The Court must examine this moment carefully because the Court's inquiry is confined to whether the deputies were "in danger at the moment of the threat that resulted in [their] use of deadly force." *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) (rejecting plaintiffs' urging that the court examine the circumstances surrounding a preceding forced entry that led to the fatal shooting because the court need only look to the time of the shooting to determine reasonableness). Based on

the circumstances facing Vasquez and Sanchez right before they shot Flores[4] and construing the facts in favor of Plaintiffs, the Court finds that a reasonable officer would have concluded that Flores, who was stationary for several seconds and put his hands in the air while remaining otherwise motionless, was no longer resisting and had signaled surrender. Therefore, the deputies' use of deadly force was not reasonable. *See Reyes v. Bridgwater*, 362 F. App'x 403, 407–09 (5th Cir. Jan. 22, 2010) (holding that it was unreasonable for an officer to use deadly force when the suspect was armed with a knife "at a safe distance away from the officers" and was not advancing toward the officers); *see also Cullum v. Siemens*, No. SA-12-CV-49-DAE, 2013 WL 5781203, at *9-10 (W.D. Tex. Oct. 25, 2013) (finding deadly force was unreasonable because the armed suspect's hand was "palm-up in a 'stop' gesture" that was "submissive" and he did not present an immediate threat); *Jamison v. Metz*, 541 F. App'x 15, 19–20 (2d Cir. Sept. 12, 2013) (holding that officers were not entitled to qualified immunity where the suspect had stopped and was in an act of surrendering by putting his hand in the air); *Green v. Taylor*, 239 F. App'x 952, 958 (6th Cir. Aug. 30, 2007) (holding that the officer's use of deadly force was not reasonable because the suspects were stopped and attempting to surrender with hands in the air or on the steering wheel); *Robinson v. Nolte*, 77 F. App'x 413, 414 (9th Cir. Oct. 2, 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had "his arms raised over his head in a classic surrender position, with a gun in his lap"); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1185 (D. Haw. 2003) (finding that a reasonable jury could conclude that the officer's conduct violated the suspect's Fourth Amendment rights when the suspect was shot as he was stepping away from a car with his hands in the air).

---

[4] In addition to the evidence presented by the parties, the Court notes that "[v]ideo evidence can be dispositive on a motion for summary judgment . . . [and the Court is] to rely on clear video evidence when such evidence is available." *Guerra v. Bellino*, No. 15-51252, 2017 WL 3397430, at *3 (5th Cir. Aug. 8, 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). In this case, the parties do not dispute whether the video should be considered and both parties contend the video supports their differing versions of the facts. As noted, the video does not resolve all of the factual disputes.

The deputies assert that several analogous cases support their entitlement to qualified immunity; however, the facts of those cases are not sufficiently similar to make the cases analogous: *Mullinex v. Luna*, 136 S.Ct. 305, 309 (2015) (noting that the fleeing, reportedly intoxicated suspect threatened to shoot officers during a high-speed car chase and was moments away from encountering an officer); *Manis*, 585 F.3d at 844–45 (holding that the officer was entitled to qualified immunity where the suspect, after being roused when passed out in his car, reached under the seat of his car in defiance of the officers' commands and "moved as if he had obtained the object he sought" and that fact was not in dispute); *Mendez v. Poitevent*, 823 F.3d 326, 332–33 (5th Cir. 2016) (holding that an officer was entitled to qualified immunity where "[i]n the moments leading up to the shooting, [the suspect] had struggled violently and aggressively against [the officer] . . . disarmed him of his baton; prevented him from using his radio to call for backup; potentially attempted to obtain his gun; concussed and disoriented him; and broke free of his grasp; at the precise moment the officer's vision is impaired and he fears losing consciousness—and the evidence indicates that it was not apparent to [the officer] that [the suspect] was running away"). The deputies also rely on *Guerra v. Bellino*, No. 15-51252, 2017 WL 3397430 (5th Cir. Aug. 8, 2017).[5] The court's holding in *Guerra* is equally inapposite. In *Guerra*, the suspect was moving rapidly either at the officer or close to where the officer was previously positioned from just a car's length away from the officer. *Id.* at *4. Whereas in this case, Flores was not only at a much greater distance from the deputies, but he also was not moving at all.[6]

In their motion, the deputies categorize many instances from the incident as "deadly force scenarios," (Deputies' Motion for Summary Judgment, Dkt. 110, at 4–7), and argue that the

---

[5] The deputies cite to a June decision issued by the Fifth Circuit in the same case, but that opinion was withdrawn and superseded by the opinion discussed in this order.

[6] The Court also notes that the deputies encourage this Court to follow cases that contradict their assertion—discussed *infra*—that the Court must focus only on the totality of the circumstances in determining whether deadly force was justified. For example, in *Guerra*, the Fifth Circuit stated that the suspect's "cooperation prior to the point at which he charged [the officer was] immaterial" because the officer's actions "are to be judged at the time of the shooting." *Guerra*, 2017 WL 3397430, at *4.

deputies' conduct should be judged by the totality of the circumstances, not the moment of the shooting, *id.* at 12–16. Regarding the other alleged deadly force scenarios, the Court is not called upon to decide whether it would have been reasonable for an officer to use deadly force in those other instances since deadly force was not used during those "scenarios," and the Court will not speculate about the reasonableness of deadly force during other parts of the incident. Moreover, to the extent that the deputies argue that a previous instance during which it may have been reasonable for an officer to use deadly force creates a lasting presumption of reasonableness, the Court disagrees. While Flores may have posed an immediate and significant threat of harm at some previous point during the encounter, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009). In *Lytle*, the suspect drove a car towards the police officer, which the Fifth Circuit suggested may have led a reasonable officer to use deadly force, but the officer did not fire his gun at the car until the car was moving away from the officer and was three or four houses away. *Id.* The Fifth Circuit therefore concluded that "even were we to assume that shooting at the Taurus was reasonable at the moment it was backing up toward [the officer], that does not necessarily make his firing at the vehicle when it was driving away from him equally reasonable." *Id.*

To support their argument regarding the totality of the circumstances, the deputies rely on *Clayton v. Columbia Casualty Company*, in which the Fifth Circuit affirmed qualified immunity for an officer who shot a suspect, to support their theory. 547 Fed. App'x 645 (5th Cir. Nov. 26, 2013). The *Clayton* facts are not analogous.[7] In *Clayton*, the suspect threatened to shoot the deputy who thought the suspect had a gun; the suspect had a knife and was cutting himself on the neck; despite demands to stop, the suspect continued to move towards the deputy; an eyewitness described the

---

[7] One similarity to this case is that the suspect in *Clayton* also expressed a desire to commit suicide by cop. *Id.* at 647–48.

suspect's movement towards the deputy as "real ugly like, scary like" and he was shouting at the

deputy; the suspect kept walking "aggressively" while the deputy once again told him to stop; the

deputy was between the suspect and the victim and other innocent bystanders; and the deputy shot

the suspect, whose arms were at his side, once he was within five feet of the deputy. *See id.* at 647–

48, 650.

  The district court and the Fifth Circuit in *Clayton* were confronted with a different factual

scenario, and, on appeal, the main factual point of contention was whether the suspect was still

holding a knife as he aggressively walked towards the deputy. *Id.* at 651–52. The Fifth Circuit found

"much evidence" to show that the suspect still had the knife, including the knife found near the

suspect's body, but the court also concluded that whether the suspect held a knife at the time he was

shot was not outcome determinative. *Id.* at 652. Among many differences between the facts of

*Clayton* and the instant case, the most significant are that, in *Clayton*, the suspect was moving towards

the deputy in a scary and aggressive manner, and the deputy fired his gun when the suspect was

within only five feet, arguably almost within the striking zone—with the suspect's forward motion—

to a reasonable officer. The moment of the shooting therefore was not as it was in this case where

Flores was not moving in any direction, much less towards the deputies, for several seconds and had

his hands in the air and was shot from a distance of almost thirty feet. (Flash drive containing video,

Dkt. 131, and Plaintiffs' Expert Report, Dkt. 129, Ex. 6, at 16–17). Therefore, the Court finds

*Clayton* neither dispositive nor instructive.

  Finally, in reaching the conclusion that Plaintiffs have overcome the first prong of the

quality immunity inquiry, the Court follows the Fifth Circuit's guidance that "the reasonableness of

an officer's conduct under the Fourth Amendment is often a question that requires the input of a

jury. This is not only because the jury must resolve disputed fact issues but also because the use of

juries in such cases strengthens our understanding of Fourth Amendment reasonableness." *Lytle*, 560 F.3d at 411.

2.    <em>Flores's Constitutional Right Was Clearly Established</em>

For the second prong of the qualified immunity inquiry, the Court analyzes whether Flores's constitutional right was clearly established at the time of the incident. A right is clearly established when "the contours of a right are sufficiently clear that every reasonable official would have understood that what [the officer] was doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted). While a case need not be directly on point, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In this case, the Court surveys the law as it existed on August 28, 2015, the date of the shooting. The deputies maintain that Flores's right was not clearly established but only cite general propositions of how the analysis proceeds for this second prong and do not argue (1) that there was a lack of relevant case law or (2) cases held that suspects' similar rights were not clearly established. (Deputies' Reply in support of their Motion for Summary Judgment, Dkt. 134, at 5–9).[8] When he was killed by the deputies, Flores was in plain sight, was not advancing towards the deputies, raised his arms in apparent surrender with the knife palmed in one hand, stood motionless, and was more than twenty feet away from both deputies. (Flash drive containing video, Dkt. 131, and Plaintiffs' Expert Report, Dkt. 129, Ex. 6, at 16–17).

Ample cases show that shooting a suspect under these circumstances was a violation of clearly established law. *See Reyes*, 362 F. App'x at 407–09 (holding that it was unreasonable for an officer to use deadly force when the suspect was armed with a knife "at a safe distance away from the officers" and was not advancing toward the officers); *Cullum*, 2013 WL 5781203, at *9-10 (finding deadly force was unreasonable because the armed suspect's hand was "palm-up in a 'stop'

---

[8] In their opening brief, the deputies do not substantively address the second prong. (Dkt. 110).

gesture" that was "submissive" and he did not present an immediate threat); *Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998)[9] ("[A]ccepting as true, as we must, [the suspect's] version of the facts immediately preceding the shooting, [the officer's] alleged decision to use potentially deadly force upon a suspect who stopped and raised his arms in the air when commanded to do so does not qualify as reasonable under the remaining factors we must consider."); *Jamison*, 541 F. App'x at 19–20 (holding that officers were not entitled to qualified immunity where the suspect had stopped and was in an act of surrendering by putting his hand in the air and where their conduct violated clearly established law); *Green*, 239 F. App'x at 958 (holding that the officer's use of deadly force was not reasonable because the suspects were stopped and attempting to surrender with hands in the air or on the steering wheel and concluding that it was a violation of clearly established law); *Robinson*, 77 F. App'x at 414 (holding that the use of deadly force violated the suspect's clearly established Fourth Amendment rights where the suspect had "his arms raised over his head in a classic surrender position, with a gun in his lap"); *Kanae*, 294 F. Supp. 2d at 1185 (finding that a reasonable jury could conclude that the officer's conduct violated the suspect's Fourth Amendment rights when the suspect was shot as he was stepping away from a car with his hands in the air).

Accordingly, this Court concludes that Flores's constitutional right was clearly established in August 2015, and Plaintiffs have satisfied the second prong of the qualified immunity inquiry. The deputies therefore are not entitled to qualified immunity.

## VI. CONCLUSION

For these reasons, the Court **GRANTS** [112] Bexar County's Motion for Summary Judgment and **DENIES** [110] Deputies Vasquez and Sanchez's Motion for Summary Judgment.

---

[9] This Court may also look to other circuits to determine whether a right was clearly established. *See McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (looking to sister circuits).

**SIGNED** on October 11, 2017.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE